1

2

3

4

5

6                              UNITED STATES DISTRICT COURT

7                            NORTHERN DISTRICT OF CALIFORNIA

8

9    VINCENT P. JACOBO,
                    Petitioner,              Case No. 24-cv-03271-RS (PR)
10
11        v.                                 **ORDER DENYING PETITION FOR
                                             WRIT OF HABEAS CORPUS**
12   PATRICK COVELLO,
                    Respondent.
13

14

15                                    **INTRODUCTION**

16          Petitioner seeks federal habeas relief under 28 U.S.C. § 2254 from his California

17   state conviction for murder.  His claim that the trial court's instruction on mutual combat

18   or being the initial aggressor (CALCRIM 3471) violated his due process right to a fair trial

19   and to present a defense lacks merit.  His contention that the instruction was not supported

20   by substantial evidence fails to state a federal claim; even if it were a proper federal claim,

21   the instruction was supported by substantial evidence; because there was overwhelming

22   evidence against self-defense, his claim that his self-defense argument would have

23   succeeded had the instruction not been given fails; and there was no prejudice.

24   Accordingly, the petition for habeas relief is DENIED.

25                                    **BACKGROUND**

26          In 2022 a San Francisco County Superior Court jury convicted petitioner of

27   second-degree murder (Cal. Penal Code § 187(a)) and illegal possession of a firearm by a

28   felon (*id.* § 29800(a)(1)).  *People v. Jacobo*, No. A166514, 2023 WL 6802948, at *3 (Cal.

Ct. App. Oct. 16, 2023); Ans., State Appellate Opinion, Dkt. No. 11-42 at 6-7. The jury also found true the allegation that petitioner intentionally discharged a firearm, causing great bodily injury (Cal. Penal Code § 12022.53(d)). (Ans., State Appellate Opinion, Dkt. No. 11-42 at 7.) Petitioner admitted at trial that he had two prior strike convictions. (*Id.*) A sentence of 70 years to life was imposed. (*Id.*) Petitioner's attempts to overturn his convictions in state court were unsuccessful. This federal habeas petition followed.

The facts, as determined by the state appellate court, are as follows. In 2013, the victim, White, lived in San Francisco with his grandmother, Mary H., Mary's son Isidor H., petitioner, and several other persons, including her grandchildren. (*Id.* at 2.) Several years earlier, petitioner's friend, Isidor H., had invited petitioner to stay in his room at his mother's house because Jacobo was about to be "unhoused." (*Id.*)

At the time of his death White was 28, six feet one inch tall, and 238 pounds. (*Id.* at 3.) He was a drug user and bore a tattoo on his neck ("Hood Certified, Turf Tested"). (*Id.*) Witnesses testified that White never owned or used a gun. (*Id.*) Petitioner also used drugs, drank a great deal, had a bad temper, and often got into arguments. (*Id.*) He had been convicted of robbery and had a felony conviction for using a firearm. (*Id.*) Evidence showed that petitioner sold guns and had ammunition. (*Id.*)

Petitioner and White often had arguments and had "a couple of physical altercations." (*Id.*) In one, they fought over petitioner's actions toward one of the children who had lived in the house a year or two before White's death. (*Id.*) Punches were exchanged, and petitioner's face was bruised. (*Id.*) Roughly a month before his death, White complained to petitioner about the quality of his work on Isidor H.'s car, and told him to stop that work. (*Id.*) Petitioner punched White, who then pushed petitioner down the stairs. (*Id.*) Petitioner said he would get a gun and shoot him. (*Id.*)

On the evening of October 13, 2013, White was fixing his bicycle in his room and Jacobo was not at home. (*Id.*) White left the house the next day between 3 and 4am. At roughly 3:47am, petitioner texted White to tell him that he was "[d]own by Folsom

1    Park. Still waiting." (*Id.*) A bit later, petitioner texted White again, saying, "We can still

2    work dude for eight or a quarter." (*Id.*) At 4:24am, he sent White a text that said,

3    "Coming up 21st Street and Mission, Bartlett." (*Id.*) A minute later, petitioner sent White

4    a text which read "Dude got spooked." (*Id.* at 3-4.) White read all of these texts. (*Id.* at

5    4.)

6        Video recordings show White bicycling north toward 21st Street early that morning.

7    After meeting petitioner at roughly 4:30am, they walked toward Bartlett Street. (*Id.*)

8    Video showed White dropping his bike and running, with petitioner chasing him into

9    Bartlett Street. (*Id.*) White fell, rose, and kept running away from petitioner, while

10    leaving a trail of blood behind him. (*Id.*) Gunshots awoke several neighbors at the time

11    White was shot. (*Id.*) James V., who lived on Bartlett Street, awoke to the sound of

12    gunshots at roughly 4:30am. (*Id.*) He heard about five shots, followed by a second-long

13    pause, and then heard two more shots. (*Id.*) He then heard someone "moan or scream

14    about being shot." (*Id.*) From his window he saw a bicycle, but no people, and then called

15    911. (*Id.*)

16        At 4:37am, Jody B. and James M., who lived together on Bartlett Street, awoke to

17    the sound of gunshots. (*Id.*) Jody heard "two loud noises followed by a pause [of less than

18    minute] and then a couple more." (*Id.*) She also heard "yelling" in what appeared to be an

19    argument. (*Id.*) James M. heard about seven gunshots with some "pauses in between."

20    (*Id.*)

21        At 4:30am, Michelle V., who also lived on Bartlett Street, awoke to the sound of

22    two men arguing. (*Id.*) She then heard three or four gunshots and then someone talking.

23    (*Id.*) From her window, she saw a bicycle lying on the sidewalk. (*Id.*)

24        Police Officer Antonio Balingit arrived at the scene at roughly 4:41am. (*Id.* at 5.)

25    He saw White "lying face down on the ground in the middle of Bartlett Street." (*Id.*)

26    White was declared dead at the scene at 4:48am, after the officers had tried CPR. (*Id.*) A

27    plastic bag containing white powder was found next to White's foot; a .25 caliber shell

United States District Court
Northern District of California

1    casing rolled out from underneath his body; and four more .25 caliber shell casings, along

2    with a 9mm simunition or blank.  (*Id.*)  The blank was found "partially buried in the

3    detritus of the gutter" on Bartlett Street.  (*Id.*)  It was determined that all five .25 caliber

4    shell casings came from the same gun.  (*Id.*)  The blank, which was rusted and worn and

5    appeared older than the .25 caliber shell casings, and had been fired from a different gun,

6    and appeared to have been in White's body "for a long period of time."  (*Id.* at 5, 6.)

7    White's bicycle and cell phone were found nearby, but no weapon was found.[1]  (*Id.* at 5.)

8          Five visible gunshot wounds were found on White's body:  one on the left side of

9    his neck; one on his upper right arm; two in his back; and one on his left buttock.  (*Id.*)

10   The neck wound was caused from a shot from an "intermediate range," that is, "some

11   inches or feet" away.  (*Id.*)  The trajectory of the bullet that caused this wound indicated

12   that the killer had stood above White when firing.  (*Id.*)  The remaining four shots were

13   "distant" shots, that is, from "many feet to yards or greater" away.  (*Id.*)  All the shots

14   appeared "fresh" and caused White's death.  (*Id.* at 5-6.)  A total of six bullets were

15   removed from White's body.  (*Id.* at 6.)  He also had some scrapes to his knees and right

16   hand, and a contusion to the right side of his scalp.  (*Id.*)  DNA from the bloodstains on

17   petitioner's shoes matched DNA from White's blood.  (*Id.* at 6.)

18         As grounds for federal habeas relief, petitioner alleges the trial court erred by giving

19   an instruction on mutual combat, CALCRIM 3471 ("Right to Self-Defense: Mutual

20   Combat or Initial Aggressor").  (Pet., Dkt. No. 1 at 9.)

21                              **STANDARD OF REVIEW**

22         Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this

23   Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

24

25   ─────────────────────

26   [1] Roughly a month after White's death, Michelle V. found a .25 caliber shell casing near
     her house and gave it to the police.  (*Id.* at 6.)  "The shell casing appeared to be potentially
     associated with the five .25 caliber shell casings previously discovered at the scene of
27   White's death."  (*Id.*)

28

United States District Court
Northern District of California

pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

### DISCUSSION

Petitioner claims that the trial court violated due process when it gave an instruction on a person's right to self-defense if he started a fight or engaged in mutual combat (CALCRIM 3471). (Pet., Dkt. No. 1 at 5, 16-49.) He contends that the instruction was not supported by substantial evidence. (*Id.* at 23-24.) Also, because the instruction conflicted

United States District Court
Northern District of California

1  with petitioner's self-defense arguments, it violated his due process right to present a

2  defense and resulted in prejudice.  (*Id.*)

3        The trial court instructed the jury on CALCRIM 3471, along with other instructions

4  on self-defense and imperfect self-defense:

5        A person who engages in mutual combat or who starts a fight has a right to
       self-defense only if; one, he actually and in good faith tried to stop fighting;
6        and two, he indicated by word or by conduct to his opponent in a way that a
       reasonable person would understand that he wanted to stop fighting and that
7        he had stopped fighting; and three, he gave his opponent a chance to stop
       fighting.  If the defendant meets these requirements, then he had a right to
8        self-defense if the opponent continued to fight;

9        [H]owever, if the defendant used only non-deadly force and the opponent
10       responded with such sudden and deadly force that the defendant could not
       withdraw from the fight, then the defendant had the right to defend himself
11       with deadly force and was not required to try to stop fighting or communicate
       the desire to stop to the opponent or give the opponent a chance to stop
12       fighting.

13       A fight is mutual combat when it began or continued by mutual consent or
14       agreement.  That agreement may be expressly stated or implied and must
       occur before the claim to self-defense arose.

15  (Ans., RT, Dkt. No. 11-32 at 31-32.)

16        The state appellate court rejected petitioner's claims that the instruction was not

17  supported by substantial evidence and that the giving of the instruction was prejudicial.  It

18  first found that "there was substantial evidence that [petitioner] started a fight with White."

19  (Ans., State Appellate Opinion, Dkt. No. 11-42 at 9.)  Petitioner "had a bad temper and

20  held grudges"; roughly a month before the killing, he had threatened to obtain a gun and

21  shoot White; there was no evidence that White had any weapons on the day of the killing;

22  video recordings showed petitioner chasing White as he ran away; petitioner shot White

23  multiple times from behind; and there was no evidence petitioner suffered any injuries

24  from his interaction with White.  (*Id.* at 9.)

United States District Court
Northern District of California

The state appellate court next found that there was "substantial evidence" that petitioner and White engaged in mutual combat. (*Id.* at 10.) The two had a history of conflict, which included "at least two verbal arguments in the recent past that led to physical altercations"; one could infer from the threat petitioner made to White in their fight a month before the killing that the two were "resuming that fight at the time of White's death." (*Id.*)

Also, because "the evidence against self-defense or imperfect self-defense was overwhelming," there could not have been prejudice. (*Id.* at 12.) "[S]elf defense rules require the defendant to stop using force when the danger of an attack or unlawful touching no longer exists." (*Id.*) Here, video recordings showed White running away while petitioner chased him with a gun; White must have been bleeding during the chase; petitioner shot him five times; three of the shots hit him in the buttocks or back, and one was fired only inches or feet away and had a downward trajectory, which indicates that he was not standing when he was shot; and there is nothing showing that White was armed. (*Id.*)

The state appellate court rejected petitioner's claim that the length of deliberations and the jury's questions to the court regarding first and second degree murder indicated that this was a close case. "That the jury struggled in deciding between first-degree and second-degree murder does not compel a contrary conclusion. Neither the jury's notes or questions nor the length of their deliberations suggests that the jury was wrestling with [petitioner's] claims of self-defense or imperfect self-defense." (Id.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury

instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

A habeas petitioner is not entitled to relief unless the instructional error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.*

Habeas relief is not warranted on this claim. As an initial matter, the United States Supreme Court has held that it does not violate due process to instruct a jury on a legal theory that lacks evidentiary support "since jurors are well equipped to analyze the evidence." *Griffin v. United States*, 502 U.S. 46, 59-60 (1991). Consequently, there is no "clearly established law that constitutionally prohibits a trial court from instructing a jury with a factually inapplicable but accurate statement of state law." *Fernandez v. Montgomery*, 182 F. Supp. 3d 991, 1011 (N.D. Cal. 2016); *see also Steele v. Holland*, No. 15-CV-01084-BLF, 2017 WL 2021364, at *8 (N.D. Cal. May 12, 2017) ("giving an instruction which is not supported by evidence is not a due process violation."); *Larrabee v. Pollard*, No. EDCV180049JGBPVC, 2020 WL 5665812, at *21 (C.D. Cal. Aug. 13, 2020) (finding factual challenge to trial court's use of CALCRIM 3471 did not state a cognizable federal claim). Because there is no clearly established right under these circumstances, there is no federal habeas relief for such petitioner's claim.

Also, even if there were a viable federal claim, it would fail because there was substantial evidence to support the giving of the instruction. The state appellate court reasonably determined that there was substantial evidence that petitioner started a fight with White. The two men had had a history of disputes; about a month before White was killed, petitioner threatened to obtain a gun and shoot him; White was unarmed on the day

United States District Court
Northern District of California

1    he was shot; video recordings showed petitioner chasing White as he ran away; petitioner

2    shot White multiple times from behind; and there was no evidence petitioner suffered any

3    injuries from his interaction with White.

4        The state appellate court also reasonably determined that there was "substantial

5    evidence" that the two men engaged in mutual combat.  Again, the two had a history of

6    conflict, which included at least two recent verbal arguments that turned into physical

7    altercations.  Also, one could infer that the two were resuming the fight started a month

8    before when petitioner threatened to get a gun and shoot White.

9        Also, significantly, there has been no showing that the instruction had a substantial

10   or injurious effect on the verdict.  First, any contention that the instruction interfered with

11   his ability to present a self-defense cannot succeed.  CALCRIM 3471 did not prevent such

12   a defense; rather it stated that under certain specific circumstances, petitioner could not

13   claim it.  Also, the jury was free to disregard CALCRIM 3471, according to the trial

14   court's instructions:  "Some of these instructions may not apply, depending on your

15   findings about the facts of the case.  Do not assume that because I give a particular

16   instruction that I am suggesting anything about the facts.  After you have decided what the

17   facts are, follow the instructions that do apply to the facts as you find them."  (Ans., RT,

18   Dkt. No. 11-32 at 11.)

19        Second, the state appellate court reasonably determined that there was no prejudice

20   because "the evidence against self-defense or imperfect self-defense was overwhelming."

21   Video evidence revealed that White was running away while petitioner chased him with a

22   gun; physical evidence showed that petitioner shot White five times during this chase and

23   that three hit him in the back or buttocks; and one shot's trajectory indicates that White

24   was not standing when he was shot.  Under the rules of self-defense, a defendant must stop

25   using force when the danger of an attack no longer exists.  The video evidence shows that

26   petitioner was not under threat of attack by White when the shooting occurred.

27

28

United States District Court
Northern District of California

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
CASE NO. 24-cv-03271-RS

1    Petitioner claims that the length of deliberations (five days) and the jury's questions

2 to the court during deliberations indicates that this was a "close" case. (Pet., Dkt. No. 1 at

3 44.)  He concedes, however, that the jury's questions "indicated a focus on the distinction

4 between first and second degree murder," not a focus on self-defense. (*Id.* at 45.)  The

5 state appellate court's rejection of this claim was reasonable.  Any hesitation related to

6 whether petitioner was guilty of first or second degree murder, not to questions about self-

7 defense.

8    The state court's rejection of petitioner's claim was reasonable and is therefore

9 entitled to AEDPA deference.  This claim is DENIED.

10                      **CONCLUSION**

11    The state court's denial of petitioner's claims did not result in a decision that was

12 contrary to, or involved an unreasonable application of, clearly established federal law, nor

13 did it result in a decision that was based on an unreasonable determination of the facts in

14 light of the evidence presented in the state court proceeding.  Accordingly, the petition is

15 DENIED.

16    A certificate of appealability will not issue.  Reasonable jurists would not "find the

17 district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

18 *McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability

19 from the Ninth Circuit Court of Appeals.  The Clerk shall enter judgment in favor of

20 respondent, and close the file.

21    **IT IS SO ORDERED.**

22 **Dated:**  November  14 , 2025

23                                           _____

24                                           RICHARD SEEBORG
                                            Chief United States District Judge

United States District Court
Northern District of California